
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-14086-CR-GRAHAM/LYNCH

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DENNIS LEE KNOWLES,

    Defendant.

_____/



FILED by ___ D.C.

JAN 21 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

### REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [D.E. #35]

**THIS CAUSE** having come on to be heard for an evidentiary hearing on January 19, 2011, at which time this Court received testimony, evidence and arguments of counsel, and this Court having reviewed the motion, the government's response, as well as the Defendant's Proffer In Support of a Franks Hearing [D.E. #59] and this Court otherwise being advised in the premises, makes the following recommendations to the District Court:

### TESTIMONY AND EVIDENCE

    1.    Since the subject of the Motion To Suppress is a state search warrant, the Defendant had the burden of proceeding. The Defendant called as his first witness Detective Troy Norman of the St. Lucie County Sheriff's Office. Detective Norman has been a police officer for eleven years, all with the St. Lucie County Sheriff's Office. He has been a detective for four years. He has prepared between fifty and one hundred affidavits for search warrants in the past. He is the case agent in this particular matter.

    2.    Defendant's Exhibit No. 1 admitted into evidence at this hearing is Detective Norman's Application For State Search Warrant which was presented to State Circuit Judge Lawrence Mirman. He testified that the information contained with the search warrant was received based upon his discussions and debriefings from the confidential informant (CI) in this case. Detective Norman testified that the CI told him that the person

from whom he bought narcotics on each of these occasions as set forth in the Affidavit, Defendant's Exhibit No. 1, was the same person and was known by the street name of "Bald Head".

3. Defendant's Exhibit No. 2 admitted into evidence at this hearing is a two page document containing copies of some of the currency utilized during one of the two purchases of narcotics purportedly made from this Defendant along with handwritten notes of Detective Norman taken during his discussions and debriefings of the CI. He testified that the handwritten rough notes were made contemporaneous with his conversations with the CI.

4. The first transaction during which the Defendant purportedly sold crack cocaine to the CI from the Defendant's residence at 611 North 20th Street, Apartment A, Fort Pierce, Florida, was on June 29, 2010. The second controlled buy from the Defendant by the CI in this case was on September 21, 2010.

5. After the first controlled buy, the CI referred to the Defendant as "Baldee" as referenced on page 1 of Defendant's Exhibit No. 2, being Detective Norman's rough notes of his discussions with the CI. Page 2 of that exhibit refers to the person who sold the narcotics to the CI as Bald Head. Detective Norman testified that he discussed this with the CI and the CI was absolutely certain that it was the same individual who sold him the crack cocaine from that residence on the dates set forth in the Affidavit For Search Warrant.

6. When defense counsel inquired as to the discrepancy concerning the street name of the individual who purportedly sold the crack cocaine to the CI, Detective Norman explained that some individuals are known by different street names. He testified that the CI could know this particular Defendant as Baldee but that the Defendant was also known

more commonly by the street name Bald Head. Detective Norman testified that if the CI was one of only a few individuals which may have known the Defendant as Baldee, then referring to the Defendant as Baldee in the Affidavit For Search Warrant may have disclosed the CI's identity. Detective Norman testified that therefore it was decided to use the more commonly known street name for this particular Defendant, which the CI asserts is Bald Head.

7. Counsel for the Defendant referenced the physical descriptions of the person who sold the crack cocaine to the CI as set forth in the rough notes in Defendant's Exhibit No. 2. After the first controlled buy on June 29, 2010, Detective Norman's rough notes describe the person who sold the crack cocaine to the CI as being 5'8" tall, 180 pounds, dark complected, with two gold teeth on the top, and 45 to 50 years of age.

8. The second page of Defendant's Exhibit No. 2 reflects Detective Norman's rough notes which list the physical description of the person who sold the crack cocaine to the CI on September 21, 2010. The rough notes reflect the individual to be 5'10", 205 pounds, 45 to 50 years of age, bald head, and "had tube."

9. When questioned about the discrepancy in the physical description of the individual who purportedly sold the crack cocaine on two occasions to the CI, Detective Norman testified that the second description set forth on page 2 of the rough notes after the September 21, 2010 transaction were taken down after the CI had more time to think about the specific height, weight, and approximate age of the individual who sold the CI the crack cocaine. Detective Norman testified that different people view individuals differently as to height, weight and age. Detective Norman testified that he did not believe that the differences in the physical descriptions after each of these controlled buys was significant

and he did not bring that to the attention of Judge Mirman at the time that the Affidavit For Search Warrant was submitted.

10. Detective Norman also testified as to the details concerning each controlled buy. Prior to these two controlled buys, he knew this CI to have been previously utilized on several occasions and to have been proven reliable. Before each controlled buy involving the Defendant, Detective Norman in the presence of another law enforcement officer searched the CI for any narcotics, money, or other contraband. The CI's vehicle was also searched. Once it was determined that there was no money, contraband, drugs, or any other evidence on either the CI or in the CI's vehicle, the CI was then given serialized funds to go to the Defendant's residence at 611 North 20th Street, Apartment A, Fort Pierce, Florida, to purchase crack cocaine. On each occasion, a listening device was placed on the CI to monitor conversations. There was no transcript or recording of what was monitored or picked up on that listening device. The listening device was utilized by law enforcement to maintain contact with the CI and to hear what was transpiring on each of these occasions.

11. On June 29, 2010 and September 21, 2010, after searching the CI and the CI's vehicle, law enforcement followed and kept visual surveillance of the CI alone in his vehicle until he arrived at the Defendant's residence at the address listed in the Affidavit For Search Warrant. Law enforcement then maintained visual contact watching the CI walk up to and into the Defendant's residence. Visual contact of the CI was then lost. The CI, on each occasion, remained inside the residence no longer than one to two minutes and then exited. Visual surveillance was again made of the CI exiting the residence, getting into the CI's vehicle and driving away to a pre-designated meeting place a couple of miles away.

12. At the pre-designated meeting place, the CI was again searched and the crack cocaine purchased from the Defendant was turned over to Detective Norman. This procedure occurred subsequent to each of the two controlled buys mentioned above. On each occasion, the suspected crack cocaine field tested positive for cocaine. A later lab analysis also was positive for the presence of cocaine on the narcotics the CI purchased from the Defendant at the residence.

13. Detective Norman testified that except when the CI was inside the Defendant's residence for a very brief time on each occasion, the CI was clearly visible to Detective Norman and the other law enforcement officers involved in each of these controlled buys. Further, Detective Norman reiterated that the CI was positive that it was the same person who sold him the crack cocaine at the Defendant's residence on June 29, 2010 and September 21, 2010. Neither Detective Norman nor any other law enforcement officer saw the physical transactions between the CI and the Defendant. The Defendant was not observed at the residence by either Detective Norman or any other law enforcement officer on the dates of the controlled buys. Detective Norman relied upon the description, information and veracity of the CI in identification of the individual who sold the CI the crack cocaine.

14. Detective Norman testified that he made later attempts to drive by the Defendant's residence and see if he could observe the Defendant at the residence to confirm the descriptions given by the CI. Detective Norman was never able to observe the Defendant outside the residence. Detective Norman testified that he also spoke with other confidential informants concerning narcotics sales from the Defendant's residence. Those confidential informants did say that someone at that residence was "selling drugs", but no

other confidential informant could provide a legal name nor a street name for that individual.

15. Detective Norman was asked about the information contained within his Affidavit submitted to Judge Mirman in support of the search warrant and he stated that the Affidavit is true and correct. He stated there are no intentional misstatements nor omissions in the Affidavit. He stated that he placed within that Affidavit only information that he believed was accurate in respect to the two controlled buys from the residence in question on June 29, 2010 and September 21, 2010.

---

16. The only other witness called by defense counsel was the Defendant, Dennis Knowles. The Defendant testified that on the dates in question, June 29, 2010 and September 21, 2010, he was leasing the residence located at 611 North 20th Street, Apartment A, Fort Pierce, Florida. He testifies that he has never sold crack cocaine from that residence nor supplied anyone with crack cocaine to sell from his residence. He stated that other individuals live there or had access to the house on a regular basis.

17. The Defendant testified that his aunt, Tammy Liehred, lived there with him. The Defendant's cousin, Cedric Hayes, had a key and was there "from day one." The cousin could use the apartment whenever he needed to "get away from his crazy girlfriend." The Defendant testified that these individuals had complete access to the home.

18. The Defendant also testified that a next-door neighbor, Eric Simmons, would come over occasionally and watch television in the residence, even if the Defendant was not present. The Defendant stated that on occasions when the neighbor would come over,

they would watch television together and the Defendant would leave the residence allowing the neighbor to remain. He stated there are also friends of these individuals who would come and go from that residence.

19. The Defendant testified that he is not known as "Bald Head" in the community. He is not sure as to whether or not he was home on June 29, 2010. He stated that he is always busy and gone for days or sometimes weeks at a time. He testified that the same would be true as to the alleged controlled buy taking place from that residence on September 21, 2010.

20. The Defendant testified that his cousin, who regularly utilizes the residence, is 5'8" to 5'9" and weighs approximately 180 pounds. The cousin has four gold teeth. However, he is not bald like the Defendant. The Defendant testified that neighbor Simmons looks 45 to 55 years of age, and is called by a street name of "Bootie" or "Bald Head." The Defendant did not recall if neighbor Simmons was around the Defendant's residence on the dates of the alleged controlled buys. He has no specific recollection of who was at the home on the days of the controlled buys and does not even remember if he was there himself. Thereafter the Defendant rested his case.

---

21. The government called as a witness Detective Troy Norman who had previously testified. Detective Norman was the case agent in charge of the execution of the search warrant on the Defendant's residence on October 8, 2010. As this Court will relate later herein under the Analysis portion of this Report and Recommendation, the two controlled buys purportedly made from the Defendant at his residence serve solely as probable cause for issuance of the state search warrant. The evidence obtained by law

enforcement during each of those controlled buys does not serve as the basis for any criminal charge presently pending against the Defendant in this case. The criminal charge set forth in the Indictment before this Court results solely from the evidence seized from the Defendant's residence during the execution of the state search warrant on October 8, 2010 by Detective Norman and other members of the St. Lucie County Sheriff's Office.

22. On October 8, 2010, when the search warrant was executed, no one else was found at the home except the Defendant and his girlfriend who were in the bathroom when the house was entered. The Defendant's girlfriend was found with her pants down standing over a toilet. The toilet was running and the Defendant was positioned nearby his girlfriend in the bathroom. There were pieces of broken glass on the floor of the bathroom along with pieces of cocaine and a bag.

23. In the living room/kitchen area, two nickel bags of marijuana were found on a table in plain sight. A cigar tube with crack cocaine rocks was found on top of a kitchen cabinet. The crack cocaine weighed approximately 2.9 grams and was in small rocks very similar to the crack cocaine turned over by the CI after each of the controlled buys mentioned herein.

24. The microwave had a small piece of cocaine inside. It tested positive for cocaine as well. There was a razor blade found in plain view on the living room table with some residue which later tested positive for the presence of cocaine. This Court does point out that the crack cocaine purportedly seized during the search of the home was in a cigar tube and that page 2 of Defendant's Exhibit No. 2 references in Detective Norman's handwritten notes after the second controlled buy on September 21, 2010, the word "tube" and "70 to 80 rocks."

25. This was the extent of the evidence and testimony presented by the parties.

26. The Defendant argued in conclusion that Judge Mirman was not given a full and complete version of the facts in this case and that Detective Norman intentionally misled Judge Mirman by leaving out certain facts or discrepancies in the physical description of the individual who purportedly sold the crack cocaine to the CI on each of the two occasions. Counsel argued that the description of the person who sold the crack cocaine on each occasion varied greatly and that the street name associated with the person was different as well. The Defendant argues that none of these discrepancies were presented to Judge Mirman so that he could make an independent and detached decision as to whether or not the totality of the information provided in the Affidavit supported probable cause for issuance of the state search warrant.

27. The Defendant further argued that deleting the information concerning the description of the individual who purportedly sold the crack cocaine to the CI would leave an affidavit which would not establish probable cause. The Defendant argues that Judge Mirman would have wanted to know more if he was made aware of these purported discrepancies in description by Detective Norman.

28. The Defendant's Motion To Suppress also argues that the information was stale and was therefore insufficient to support probable cause for issuance of the search warrant. Counsel for the Defendant and counsel for the government both agreed that this is a legal issue and not one which is subject to any further evidence. A determination of staleness is made within the four corners of the affidavit and application of the pertinent case law.

29. Counsel for the government argued that the Defendant has not established any intentional misstatements, omissions nor any reckless disregard for the truth by Detective Norman in preparation and submission of the Affidavit In Support of Search

Warrant. Counsel for the government argues that there were two controlled buys which served as the basis for this search warrant. The specific details of those controlled buys was set forth in the Affidavit by Detective Norman. Further, counsel for the government argues that the discrepancies which the Defendant alludes to are not significant and were explained by Detective Norman in his testimony.

30.   The government also argues that the Defendant's credibility has been impeached. The government points out that while the Defendant testified that he never sold narcotics from nor permitted anyone to sell narcotics from that residence, it is a fact that narcotics were found at his residence at the time of the execution of the search warrant on October 8, 2010. The government argues that this is borne out by the seizure of the cocaine, marijuana, and other paraphernalia with cocaine residue at that time. The government argues that the Defendant's girlfriend and the Defendant were found in the bathroom with the toilet running, broken glass on the floor, and cocaine on the floor. The government argues that this "destroys" the Defendant's credibility concerning the testimony before this Court.

31.   The government also pointed out that during his testimony the Defendant did not say anything about gold teeth. There is no evidence before this Court that the Defendant has or does not have gold teeth. Counsel for the government argues that certain gold teeth can be slipped on and slipped off as one would a jewelry item for example.

32.   As to the staleness argument, counsel for the government agreed that it is a legal issue to be determined by application of the case law to the particular facts in the Affidavit for Search Warrant. The government argues that the particular facts in this case establish that this was a continuing investigation concerning controlled buys of crack

10

cocaine from the Defendant's residence. One sale took place on June 29, 2010 and the other sale took place less than three months thereafter. The search warrant was issued and executed approximately eighteen days after the second controlled buy. Counsel for the government argues that this does not constitute stale information in the Affidavit.

33.    Finally, counsel for the government argues that the CI was certain that it was the same person from whom he bought crack cocaine on each of these two occasions. When questioned and debriefed by Detective Norman, the CI was absolutely certain that it was the Defendant on each occasion and that he is more commonly known by the street name "Bald Head."

## ANALYSIS

34.    At the outset, counsel for the government argued that the Defendant was not entitled to a Franks evidentiary hearing. Counsel for the government argued that there were no affidavits filed in support of the Defendant's contention that there were deliberate misstatements by the affiant in the affidavit submitted for search warrant. This Court advised counsel for the government that it does not interpret the case law to require an affidavit. Specifically, the Defendant filed a Proffer In Support of a Franks Hearing [D.E. #59]. This was done subsequent to this Court holding a hearing on the Defendant's motion for a brief continuance of the Suppression Hearing. At that time, this Court advised the parties that it did not feel that the Defendant had made a sufficient showing to justify a Franks evidentiary hearing. However, out of an abundance of caution, the Court gave the Defendant a very brief period of time within which to file any such proffer in support of his allegations set forth in the Motion To Suppress. This Court has reviewed the proffer and believes that it complies with the case law in this regard.

35.     Specifically, to mandate a <u>Franks</u> evidentiary hearing the Defendant must make more than conclusory allegations and must be supported by more than a mere desire to cross-examine. The allegation of any deliberate falsehood or reckless disregard must point out specifically with supporting reasons, the portion of the warrant affidavit that is claimed to be false. That also must be accompanied by an offer of proof, which may include affidavits that are sworn or otherwise reliable statements of witnesses, or a satisfactory explanation of their absence. <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) and <u>United States v. Johnson</u>, 168 Fed. Appx. 390 (11th Cir. 2006).

36.     This Court has reviewed the Defendant's Proffer of Evidence [D.E. #59] and finds that it meets the minimum standard necessary for a <u>Franks</u> evidentiary hearing. None of the case law requires an affidavit. As this Court recited above, the <u>Franks</u> opinion itself requires that the Defendant point out specifically the portions of the warrant which are claimed to be false. The Defendant does that in paragraph 1 of his Proffer [D.E. #59] wherein he alleges that Detective Norman withheld and misstated information which would have been material to the issuing judge's decision and that such misstated information allegedly received from the confidential informant regarding the description of the alleged seller and the circumstances under which the alleged sales took place is the information that the Defendant is attacking. Further, the Defendant's Proffer [D.E. #59] goes on to state that the Defendant will testify that during the weeks in question he did in fact lease the residence, was present at the residence, did not sell nor permit sale of narcotics from the residence, and was not known as "Bald Head."

37.     This Court finds the allegations set forth in the Defendant's Proffer [D.E. #59] to be specific as to the areas to be challenged at an evidentiary hearing and supported by the fact that the proffered testimony of the Defendant would challenge the description given

by the CI as well as the circumstances surrounding the alleged sales of the narcotics from the Defendant's residence. As such, this Court finds that the Defendant met his burden to justify a <u>Franks</u> evidentiary hearing.

38. This Court disagrees with the Defendant's argument that the descriptions given by the CI to Detective Norman were so grossly differing that any reasonable person would see that the CI was describing different people. The reason this Court disagrees with that argument is that the age appears to have been the same as estimated by the CI on each occasion. The CI estimated the height on one occasion as 5'8" and one occasion as 5'10". To this Court, two inches is not a great discrepancy by an individual's observations. The weight was either 180 or 205. Again, this Court does not find that to be a gross discrepancy which would jump out at someone and cause them to disbelieve or question the description given by the CI.

39. After the first controlled buy, the CI referred to the person who sold the narcotics as "Baldee" and after the second buy he referred to him as "Bald Head." Detective Norman gave an explanation as to why this difference in street names may have taken place. He testified that the more commonly known street name for the Defendant was Bald Head. He further testified that after discussing this with the CI after the second buy, this was the most common street name for the Defendant. They did not wish to disclose the identity of the CI by using a street name that was only used by a few other individuals with whom the Defendant interacted. In other words, the CI may have been one of very few people who referred to the Defendant by the street name "Baldee" and by using that in the affidavit as opposed to the more common street name of "Bald Head" this could have disclosed the CI's identity. This could affect other investigations in which the CI is continuing to work. This appears to the Court to be the strongest argument the Defendant

makes concerning deliberate falsehoods or reckless disregard for the truth by Detective Norman as the affiant for the search warrant. However, this Court does not agree with the Defendant's assessment in that regard.

40. The issue of the gold teeth was raised for the first buy and not the second buy. However, there was never any mention during the Defendant's testimony or otherwise in the record as to whether or not the Defendant ever had gold teeth or presently has gold teeth. Therefore, this Court is not holding that to be a major discrepancy which had to be brought to the attention of Judge Mirman.

41. The affidavit adequately goes through the details of how each controlled buy was made. It details the previous use of this particular CI on no less than twenty-five controlled buys and that the CI was found to be past reliable. The affidavit goes through specific details of the house to be searched where each controlled buy purportedly took place. There were specific details as to continued observation of the CI until the CI entered the residence and exited the residence. Finally, there are details as to meeting the CI after each controlled buy and obtaining the narcotics which were purchased from the Defendant at that residence.

42. The Defendant has not established that Detective Norman acted with any deliberate indifference or reckless disregard for the truth in any of the descriptions given of the Defendant as the purported seller of the crack cocaine. Further, there is no evidence that Detective Norman intentionally misled Judge Mirman by omitting information. Detective Norman testified that he questioned the CI and that the CI was absolutely certain that the Defendant was the same individual who sold him the crack cocaine from the Defendant's residence on each occasion. After discussing with the CI the description the CI gave as to the Defendant after each sale, Detective Norman settled upon the

description which is set forth in the affidavit as being an individual by the name of Bald Head. There is no evidence that the decision by Detective Norman to include that information within the affidavit was a lie, an intentional misstatement, a statement made with reckless disregard for the truth or an intentional omission of any material fact.

43.     For an omission to serve as the basis of a Franks violation, it must be material such that its inclusion in the affidavit would defeat probable cause. Such omissions must have been made intentionally or with reckless disregard for the accuracy of the affidavit. United States v. Naharaj, 2007 WL 2254559 (S.D. Fla. 2007). A search warrant should be voided only if this Court finds that there was such a material omission or if a false statement was included in the affidavit by the affiant knowingly and intentionally or with reckless disregard for the truth and that the false statement included was necessary to the finding of probable cause. See Franks, supra, and United States v. Holt, 246 Fed. Appx. 602 (11th Cir. 2007). This Court can find no material omissions nor intentional misstatements nor statements made with reckless disregard for the truth.

44.     This Court in making this finding has looked at all of the evidence submitted at the hearing, including the testimony of the Defendant. The Defendant appears to match the description given by the CI to Detective Norman on both occasions. The Defendant would appear to fit within the height and weight. The Defendant is a black male and is bald. He does appear within the age range given by the CI on the two occasions to Detective Norman.

45.     The Defendant's own testimony seems to not be credible. He is not certain if he was in his residence at the time that the controlled buys took place nor does he know if anyone else was there. He denies having any knowledge of narcotics being in his house or sold from that residence by him or anyone else. However, when the search warrant is

executed, there are significant amounts of crack cocaine found in a cigar tube, which is consistent with some of the rough notes of Detective Norman contained in Defendant's Exhibit No. 2. There was marijuana in plain view. The Defendant and his girlfriend are found in the bathroom flushing the toilet with broken glass and cocaine around them. It would appear to this Court that the Defendant's assertions that neither he nor anyone with his knowledge had anything to do with narcotics at that residence is not to be believed. The Defendant's self-serving assertion that he is not referred to in the community as Bald Head is likewise only supported by his own testimony. Even without taking into consideration the Defendant's relative interest in these proceedings and reasons why he may wish to deny any involvement, the other evidence in the case impeaches his credibility as referenced above.

46.     In going to the staleness issue, the parties agree that the Court could apply the case law to the particular facts in this case to make a determination within the four corners of the affidavit submitted by Detective Norman in support of the search warrant. The facts within the four corners of the Affidavit is all that Judge Mirman had before him to determine whether or not there was probable cause to issue a search warrant for the residence in question. There is no definitive test as to staleness. Rather, the Court must determine from the facts of a particular case whether or not the information has become stale. In doing so, the Court may consider such factors as the length of time between events that created the probable cause and the issuance of the search warrant. The Court should also consider the nature of the suspected crime as to whether or not it is an ongoing activity, the habits of the accused, the character of the items sought in the search warrant, and the nature and function of the premises to be searched. United States v.

Bervaldi, 226 F.3d 1256 (11th Cir. 2000) and United States v. Jones, 2008 WL 1848789 (S.D. Fla. 2008).

47. In this case, it was alleged that there were ongoing narcotics sales from the subject residence. The most recent sale was only eighteen days prior to the issuance and execution of the search warrant. The activity within the residence was of an ongoing nature involving sales of small amounts of crack cocaine. The length of time between the June 29th buy, the September 21st buy and the October 8, 2010 issuance and execution of the search warrant is not extreme nor remote under the particular facts and circumstances of this case. This Court finds that there was sufficient probable cause set forth in the affidavit to justify Judge Mirman's decision that ongoing narcotics activity was taking place within the residence and that this was not a one time event. Further, the activity was in a residence at a location which was unlikely to relocate or move.

48. There are numerous cases in this Circuit in which eleven month delays, nine month delays, and even two year delays were not found to be stale based upon the particular facts and circumstances of the case. This case law is reviewed and cited by the Eleventh Circuit in United States v. Johnson, 290 Fed. Appx. 214 (11th Cir. 2008). Therefore, under the particular facts and circumstances in this case, this Court finds that even a delay from the first controlled buy on June 29, 2010 to the time of the issuance and execution of the search warrant in question on October 8, 2010, is not so remote in time as to nullify the search warrant.

49. As to the remaining issues of probable cause within the four corners of the affidavit, this Court finds that there was sufficient probable cause to justify Judge Mirman's issuance of the state search warrant for the Defendant's residence. As referenced previously by this Court, there are no intentional omissions, misstatements or reckless

disregard for the truth in any of the allegations set forth in the affidavit. As such, the Motion To Suppress should be denied.

**ACCORDINGLY**, this Court recommends to the District Court that the Motion To Suppress Evidence [D.E. #35] be **DENIED**.

Normally the parties would have fourteen days within which to file any objections to this Report and Recommendation. However, as stated by this Court on the record at the conclusion of the evidentiary hearing, the upcoming trial necessitates the shortening of the time period for the filing of any objections and any responses to those objections by either party. See Weiss v. Standard Ins. Co., 2009 WL 1833963 (S.D. Fla. 2009) and Grayson v. Cathcart, 2009 WL 4723271 (E.D. N.Y. 2009). The evidentiary hearing in this case was not lengthy. The facts are not complicated. The area of the law is not unique. As a result, this Court finds that any objections and any responses to any objections can easily be prepared by the parties within the time frame this Court will set forth herein. Any objections to this Report and Recommendation shall be filed no later than **12:00 noon, Tuesday, January 25, 2011,** and any response to any objections shall be filed no later than **12:00 noon, Thursday, January 27, 2011**. Copies of any objections and responses thereto shall immediately be provided to opposing counsel and Judge Graham's Chambers for review once they are filed with the Court. In this fashion, the parties and Judge Graham will be provided with copies of objections and responses without the necessity of having to wait until they are docketed and sent to Chambers via the court computer filing system.

**DONE AND SUBMITTED** this 21st day of January, 2011, at Ft. Pierce, Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

Copies furnished:
Hon. Donald L. Graham
AUSA Christopher Parente
AFPD Fletcher Peacock